J-A17023-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MALGORZATA KROLIKOWSKI | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ETHICON WOMENS' HEALTH AND | : | No. 2025 EDA 2019 |
| UROLOGY A DIV. OF ETHICON, INC., | : | |
| ETHICON, INC., JOHNSON & | : | |
| JOHNSON, GYNECARE, SECANT | : | |
| MEDICAL, SECANT MEDICAL INC., | : | |
| PRODESCO, INC., AND SECANT | : | |
| MEDICAL LLC., | : | |

Appeal from the Judgment Entered June 7, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  140102704

BEFORE:  BOWES, J., McCAFFERY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY McCAFFERY, J.:               **FILED AUGUST 11, 2020**

Malgorzata Krolikowski (Appellant) appeals from the judgment entered in the Philadelphia County Court of Common Pleas in favor of Ethicon Womens' Health and Urology a Div. of Ethicon, Inc., Ethicon, Inc., Johnson & Johnson, Gynecare, Secant Medical, Secant Medical Inc., Prodesco, Inc., and Secant Medical LLC (collectively Appellees).  A jury found Appellant did not prove she was entitled to damages for the negligent design, manufacture, and marketing of the Gynecare TVT-Secur pelvic mesh implant (pelvic mesh implant).  On appeal, she contends the trial court abused its discretion when it permitted one of her treating physicians to offer an expert opinion when the physician

was not qualified as an expert before or during trial. For the reasons below, we affirm.

The relevant facts underlying Appellant's claim are as follows. In 2008, at the age of 43, Appellant began experiencing stress urinary incontinence, which is "mainly leakage at laughing, coughing and sneezing," and urge-related leakage. N.T., 4/5/19 (AM), at 17, 22; N.T., 4/8/19 (PM I), at 21. She was referred to Dr. Matthew Fagan, a urogynecologist, who recommended surgery. N.T., 4/5/19 (AM), at 25-26; Fagan's Combined Deposition, 4/2/19, at 6. On November 4, 2008, Appellant was implanted with the pelvic mesh device, described as a "mid-urethral mesh sling." Fagan's Combined Deposition at 12, 22. Dr. Fagan's medical records for a follow-up appointment, in February of 2009, stated that Appellant reported her "urgency went away," and she was "overall 80 percent better with stress urinary incontinence."[1] *Id.* at 21.

In 2010, Appellant began experiencing heavy bleeding due to fibroids, and pain during intercourse (dyspareunia). N.T., 4/5/19 (AM), at 36-38, 66. In 2011, she underwent a uterine embolization procedure to correct the bleeding caused by her fibroids. *Id.* at 43-44, 52. After seeing an ad about mesh implant complications in 2013, Appellant visited several doctors complaining of continued urinary leakage, which she described as worse than

---

[1] At trial, Appellant testified that she did not recall telling Dr. Fagan she was "80 percent better" because she was still having symptoms, and she "wasn't happy." N.T., 4/5/19 (AM), at 35.

it was before the 2008 implantation of the pelvic mesh device. *Id.* at 54, 58-59, 65. One of those doctors was urogynecologist Dr. Lily Arya, whom Appellant saw twice, on July 20 and August 10, 2015. In 2015, Appellant also began experiencing urinary leakage during intercourse. *Id.* at 47-48.

On January 28, 2014, Appellant filed a complaint against Appellees, asserting claims of strict products liability and negligence. The case proceeded to a jury trial commencing in March of 2019. Both parties presented expert witnesses, who offered opinions as to the causation. Appellant's sole claim on appeal concerns the videotaped deposition testimony of Dr. Arya. Dr. Arya was not designated as an expert witness, but rather, testified as one of Appellant's treating physicians. After Dr. Arya reviewed her findings and recommendations for Appellant based upon her medical notes, the following exchange occurred:

> [Appellees' counsel]: And so at this point in your assessment of [Appellant], did you feel that she was experiencing any complications associated with her sling?
>
> [Dr. Arya]: So the sling was not working. That's a failure, but I wouldn't call that a complication. I call — the term that I use is — recurrent stress urinary incontinence. Any surgical procedure may not work.
>
> So this is a failure of her sling. I wouldn't call it a complication of her sling.

Arya's Combined Deposition, 4/2/19, at 57.

Before the videotaped deposition was played for the jury, Appellant objected to this exchange as "improper expert opinion testimony," noting "[t]hese treating physicians are called to give opinions that are specific to the

- 3 -

client and their care and treatment of them, and this extends beyond that."

N.T., 3/22/19, at 103, 105. Appellant's argument continued as follows:

> [Appellant's counsel]: . . . The problem that I have is where we get into this "failure" versus "complication" thing. Like those words are very important words in this case. And what the jury understands a failure to mean versus what the jury understands complication to mean, it's going to go into their determination of whether or not this product was defective.
>
> THE COURT: Well, I mean, so you have the mesh implanted and now you're incontinent and you weren't before, that's a complication. You have the mesh implanted in order to resolve incontinence and it doesn't work, that's a failure.
>
> What's so difficult about — am I wrong about that?
>
> [Appellant's counsel]: I don't want to say that you're wrong, Your Honor, but I think it's a little more complicated than that actually, because they put the sling in to treat stress urinary incontinence.
>
> THE COURT: Okay.
>
> [Appellant's counsel]: So when a woman leaks, you put the sling in to treat it. If it doesn't work, yes, you could call that a failure.
>
> THE COURT: It failed.
>
> [Appellant's counsel]: You could call that a failure, but the problem with calling it a failure is the defense is going to get up and argue to the jury — as it is their right to do — that sometimes medical devices just don't work and that just happens and that doesn't mean that the device is defective.
>
> [Appellees' counsel]: That's right.
>
> [Appellant's counsel]: But we're arguing that the failure rates that they knew about and that they were seeing, the extremely high failure rates as soon as they put the device on the market in this case, failure equals defect. Because if it fails in every single woman that you put it in —

THE COURT:  You're just going to have to argue that to the jury.  I overrule the objection.

[Appellant's counsel]:  Fair enough, Your Honor.

Would Your Honor just consider redacting that one sentence:  "Any surgical procedure may not work," because it's not specific to [Appellant] and it's an overly broad statement about surgical procedures not working and —

THE COURT:  No.  I think that explains the meaning of the word "failure[.]" . . .

*Id.* at 109-11.

The jury trial lasted more than three weeks.  On April 17, 2019, the jury returned a verdict for Appellees.  Specifically, the jury concluded Appellant proved Appellees "negligently designed, marketed, or sold" the device, but that "the negligent design, marketing or sale" of the device was not "a factual cause of her injuries[.]"  Verdict Sheet, 4/17/19, at Questions 4, 5.[2]  Appellant filed a timely post-trial motion, which was denied following argument on June 4, 2019.  That same day, the trial court entered judgment on the verdict.  This timely appeal followed.[3]

Appellant raises one issue on appeal:

Did the trial court abuse its discretion by permitting Dr. Arya, one of [Appellant's] treating physicians, to offer an expert opinion on causation when (a) [Appellees] did not designate Dr. Arya as an

---

[2] The jury also concluded Appellant failed to prove the pelvic mesh device "contained a design defect that rendered it unreasonably dangerous."  Verdict Sheet at Question 1.

[3] On July 11, 2019, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).  Appellant complied with the court's directive, and filed a concise statement on July 23, 2019.  Thereafter, the trial court filed an opinion on August 6, 2019.

expert witness; (b) [Appellees] did not qualify Dr. Arya as an expert witness during trial; and (c) Dr. Arya had no recollection of [Appellant] as a patient and expressed her causation opinion for the first time in the deposition played to the jury?

Appellant's Brief at 3.

We review a trial court's evidentiary rulings, including the admission or exclusion of testimony from an expert witness, for an abuse of discretion. **Crespo v. Hughes**, 167 A.3d 168, 181 (Pa. Super. 2017) (citations omitted).

> An abuse of discretion may not be found simply because an appellate court might have reached a different conclusion than the trial court; rather, to constitute an abuse of discretion, the trial court ruling must be the product of "manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous."

**Polett v. Public Communications, Inc.**, 126 A.3d 895, 924 (Pa. 2015) (citations omitted). Moreover,

> an appellate court is not to make a first-hand assessment of that evidence as if it were the trial court, but rather is to confine its review to the question of whether, in light of that evidence, the trial court's ruling was manifest[ly] unreasonable, or so lacking in support as to be "clearly erroneous."

**Id.** at 924-25. Furthermore, even if we determine the trial court's evidentiary ruling was an abuse of discretion, the error "does not warrant a new trial unless it was 'harmful or prejudicial to the complaining party.'" **Flenke v. Huntington**, 111 A.3d 1197, 1200 (Pa. Super. 2015) (citation omitted).

Pennsylvania Rule of Civil Procedure 4003.5 requires litigants to disclose the identity and opinions of their proposed expert witnesses to the other party during discovery. **See** Pa.R.C.P. 4003.5. The Rule further provides "[a]n expert witness whose identity is not disclosed in compliance with . . . this rule

shall not be permitted to testify on behalf of the defaulting party at the trial of the action." Pa.R.C.P. 4003.5(b). "It is clear that the purpose of Rule 4003.5 is to prevent surprise." *Miller v. Brass Rail Tavern*, 664 A.2d 525, 530 n.3 (Pa. 1995).

Moreover, when a litigant presents an expert witness at trial, they must first establish the expert's qualifications pursuant to the Pennsylvania Rules of Evidence. *See* Pa.R.E. 702(a)-(c) (to qualify an expert witness, litigant must establish "(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson; (b) [that] knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and (c) the expert's methodology is generally accepted in the relevant field"). However, pursuant to Pennsylvania Rule of Evidence 701, a lay witness may offer "testimony in the form of an opinion" if the testimony is:

> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701(a)-(c).

The dichotomy of these rules comes into play where, as here, a plaintiff's treating physician, who is not designated or qualified as an expert witness, provides an opinion concerning the cause of the plaintiff's injuries. In this situation, critical questions arise as to whether (1) the physician's opinion "was 'acquired or developed in anticipation of litigation or for trial'" pursuant to Rule

4003.5, and (2) the opinion is "rationally based on the [physician's] perceptions and helpful to a clear understanding of [their] testimony" pursuant to Rule 701. **Polett**, 126 A.3d at 924 (citation omitted); **Crespo**, 167 A.3d at 182 (citations omitted).

On appeal, Appellant contends the trial court abused its discretion when it permitted Dr. Arya to provide "an expert opinion on the cause of [Appellant's] urinary and sexual dysfunction," when Dr. Arya was neither identified as an expert witness before trial, nor qualified as an expert during trial. Appellant's Brief at 25, 26-27, 29. Preliminarily, however, we must address Appellees' claim that this argument is waived because it presents "an entirely different theory than the one [Appellant] advanced pre-trial[.]" Appellees' Brief at 28. **See** Pa.R.E. 103(a)(1)(A)-(B) (in order to raise evidentiary error on appeal, during trial, affected party must "make[ ] a timely objection . . . and state[ ] the specific ground[.]"); **McManamon v. Washko**, 906 A.2d 1259, 1274 (Pa. Super. 2006) ("In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court.") (citation omitted).

Specifically, Appellees contend the objection Appellant raised pre-trial "was that Dr. Arya offered an impermissible expert opinion on the issue of **defect**, because her theory of the case at the time was that 'failure equals defect.'" Appellees' Brief at 28. However, they claim the issue on appeal is

different, as Appellant now asserts Dr. Arya offered an improper opinion "on the cause of [Appellant's] injuries." *Id.* (citation omitted).

In her reply brief, Appellant insists she did not waive her present claim. Appellant's Reply Brief at 1. We agree. Before raising the objection to Dr. Arya's deposition testimony, Appellant's counsel stated: "Sticking with the same category of objections, **the improper expert opinion testimony**, I'm moving on to Dr. Arya's deposition." N.T., 3/22/19 (P.M. session), at 103 (emphasis supplied). Furthermore, counsel's argument focused solely on the causation question and answer at issue herein. *See id.* at 103-11. While we agree counsel did not reference Pa.R.C.P. 4003.5 or Pa.R.E. 701, we conclude the objection sufficiently preserved the issue on appeal. Thus, we decline to find waiver.

Turning to Appellant's argument, she insists Dr. Arya's testimony concerning the causation of her injuries constituted improper expert testimony. Because the testimony "implicated [Dr. Arya's] expertise as a urogynecologist to explain the cause of [Appellant's] urinary conditions, not her factual perception of [Appellant]," Appellant insists the testimony cannot be considered a lay opinion pursuant to Rule 701. *Id.* at 26. Indeed, Appellant asserts Dr. Arya's opinion testimony should have been excluded for the following three reasons: (1) Dr. Arya was not identified as an expert before trial, and did not provide an expert report pursuant to Pa.R.C.P. 4003.5; (2) Appellees did not attempt to qualify Dr. Arya as an expert witness at trial pursuant to Pa.R.E. 702; and (3) Dr. Arya's opinion on causation was

"not formed during her care and treatment of" Appellant. *Id.* at 26-27, 29. Appellant also argues the admission of this improper testimony prejudiced her. She maintains Appellees "significantly emphasized Dr. Arya's opinion testimony" during closing arguments, and "[i]n the end, the jury decided the case on exactly the point where Dr. Arya's expert opinion was directed" — that Appellees' negligence did not cause Appellant's injuries. *Id.* at 30-31. Accordingly, Appellant insists she is entitled to a new trial.

The trial court concluded, however, that "Dr. Arya's testimony was admissible both as opinion or non-opinion testimony." Trial Ct. Op., 8/6/19, at 3. First, the court noted it was "hard-pressed to believe . . . Dr. Arya's statement is an opinion at all, let alone an inadmissible expert opinion." *Id.* at 5. Focusing on Dr. Arya's comment that "failure is not a complication," the trial court found the statement "does not require any specialized expert knowledge," and was merely a "common sense" distinction. *Id.* Indeed, the court commented that one need not be "an expert to tell the difference between a failure and a complication." *Id.*

Appellant maintains this explanation "misses the mark." Appellant's Brief at 33. She argues that, when considered in context, Dr. Arya's answer constituted an opinion as to the cause of Appellant's injuries. *Id.* We agree. As Appellant emphasizes, the question posed to Dr. Arya was: "And so at this point in your assessment of [Appellant], did you feel that she was experiencing any complications associated with her sling?" Arya Combined Deposition at 57. That question clearly called for Dr. Arya's assessment as to whether the

sling "caused" Appellant's injuries. This is confirmed by Dr. Arya's answer, "[T]he sling was not working. That's a failure, but I wouldn't call that a complication." *Id.* Accordingly, we agree that, considered in context, the question posed to Dr. Arya, as well as her response, called for her opinion regarding the cause of Appellant's injuries.

Nevertheless, the court further found that even if Dr. Arya's testimony were an opinion, it was admissible as non-expert, lay opinion testimony. The court opined:

> The pivotal question the Court must ask is whether Dr. Arya's statement was developed in anticipation of litigation, or rather during her course of care and treatment of [Appellant]. Dr. Arya's testimony was based entirely on her medical notes taken during her care for [Appellant]. In discussing Dr. Arya's testimony, [Appellant] defeated her own argument when she stated during [her] motion in limine to exclude the relevant testimony, "So, again, I concede that we're talking about care and treatment of [Appellant]." N.T. 3/22/19 PM, [at] 104-105. Further, the question specifically posed to Dr. Arya that brought about the testimony at issue, was: "At this point **in your assessment of [Appellant]**, did you feel that she was experiencing any complications associated with her sling?" Arya [Combined] Deposition [ ] at 57. The very question situates the testimony as part of Dr. Arya's course of treatment, rather than a made-for-litigation opinion. This opinion was known and clearly formed in the course and treatment of [Appellant], and therefore it is admissible under Rule 4003.5 and [***Polett***].
>
> Under Rule 701, Dr. Arya was not testifying as an expert as she was not qualified before the Court, but was testifying as a treating physician. Dr. Arya's testimony was rationally based on her perception during her care and treatment of [Appellant]; the opinion was helpful to determine a fact in issue; and the testimony was not based on scientific, technical, or other specialized knowledge. Therefore, the testimony was admissible lay opinion.

Trial Ct. Op. at 6-7.

Upon our review of the record and the relevant case law, we detect no abuse of discretion in the trial court's decision to admit the testimony at issue. *See Crespo*, 167 A.3d at 181. The Pennsylvania Supreme Court's decision in *Polett* is instructive. In that case, the plaintiff underwent successful double knee replacement surgery in June of 2006. *Polett*, 126 A.3d at 899. Two months later, the plaintiff agreed to appear in a promotional video for the manufacturer of the artificial knees. *Id.* at 900. On the day of the shoot, the plaintiff was first filmed being examined by her physician. *Id.* Later that day, she learned the crew intended to film her riding a stationary bike. *Id.* Although she was concerned about riding the bike, the plaintiff assumed the film crew had consulted with her physician, so she proceeded to do so. *Id.* The plaintiff began to experience "discomfort and pain" as she was driving home after the film shoot. *Id.* Over time, her condition worsened to the point where the "tendons around [her kneecap] pulled apart causing her to, on occasion, lose her balance and fall." *Id.* at 901. The plaintiff subsequently underwent additional surgeries, which left her with "diminished mobility." *Id.* at 901-02.

The plaintiff filed an action against the manufacturer of her artificial knees and the film crew of the promotional video, asserting they "were negligent in having her ride the exercise bike during the filming of the video without first determining whether she was medically cleared to do so." *Polett*, 126 A.3d at 903. Prior to trial, the defendants presented a motion *in limine* seeking to preclude the plaintiff's treating physician from offering his opinion

as to the cause of the plaintiff's injuries because the physician did not prepare an expert report pursuant to Pa.R.C.P. 4003.5. *Id.* at 903-04. The court denied the motion "on the grounds that [the physician] was not a witness who was retained in anticipation of litigation; rather, in the court's view, [the physician] formed his opinions as to causation . . . during the course of his treatment relationship with" the plaintiff. *Id.* at 904. The jury returned a $26.6 million dollar verdict for the plaintiff, although it did find her 30% comparatively negligent. *Id.* at 906. On appeal, this Court vacated the judgment and granted a new trial, concluding, *inter alia*, that the trial court erred in permitting the physician to "testify as an expert witness." *Id.*

The Supreme Court disagreed. In considering whether the testimony was proper, the Court explained:

> [T]he [plaintiff] did not hire or retain [the physician] as an expert for the purpose of rendering an expert opinion at trial; thus, the pivotal question under Rule 4003.5, as contested by the parties, was **whether his opinion** as to causation of [the plaintiff's] injuries **was "acquired or developed in anticipation of litigation or for trial."**

*Polett*, 126 A.3d at 924 (emphases added), *quoting* Pa.R.C.P. 4003.5. In making this determination, the Supreme Court recognized that "the point in time at which [the physician] first came to his conclusion that the bicycle ride during the exercise video was the triggering event which caused [the plaintiff's] medical condition . . . which, in turn, led to [her] subsequent medical problems, is dispositive of this question." *Id.*

The Supreme Court emphasized that the trial court found that the physician's treatment notes from 2006 reflected his determination, at that time, that the stationary bike ride caused the plaintiff's subsequent injuries. *Polett*, 126 A.3d at 924. Furthermore, the Supreme Court concluded the Superior Court panel erred when it conducted its own *de novo* interpretation of the treatment notes, determining the notes reflected "only 'a temporal connection'" between the bike ride and the plaintiff's injuries. *Id.* (citation omitted). Indeed, the Supreme Court held:

> [T]he trial court's understanding of the meaning of those notes, as reflecting [the physician's] contemporaneous impression as to the cause of [the plaintiff's] medical difficulties, was neither manifestly unreasonable nor clearly erroneous, but, rather, was a rational interpretation supported by the evidence of record.

*Id.* at 925. Furthermore, the Court rejected the defendants' claim that they were "unfairly surprised" by the physician's testimony — the defendants "had full access to [the physician's] treatment notes, and critically, had participated in his deposition." *Id.* at 927.

Here, the trial court determined that Dr. Arya's "opinion" — that Appellant's injuries were not attributable to complications from her pelvic mesh implant — was formed during the course of her treatment of Appellant, and not in anticipation of litigation. Trial Ct. Op. at 6. Indeed, the question posed to Dr. Arya, which prompted the objectionable response, was "[**A**]**t this point in your assessment** of [Appellant], did you feel that she was experiencing any complications associated with her sling?" Arya Combined Deposition at 57 (emphasis added). As the trial court opined, "[t]he very

- 14 -

question situates the testimony as part of Dr. Arya's course of treatment, rather than a made-for-litigation opinion." Trial Ct. Op. at 6. Like the Supreme Court in **Polett**, we conclude the trial court's interpretation of the context of Dr. Arya's opinion testimony, "was neither unreasonable nor clearly erroneous[.]" **See Polett**, 126 A.3d at 925.

Appellant insists, however, that **Polett** is distinguishable from the case *sub judice* because in **Polett**: (1) the objecting party was notified the treating physician would be called as both a fact witness **and an expert witness** at trial (despite not having provided an expert report), and (2) the physician's "expert opinion [was] developed during treatment and memorialized in the plaintiff's medical records." Appellant's Brief at 14-15. Here, Appellant maintains, Appellees never identified Dr. Arya as an expert to the jury so that "the jury had no basis for distinguishing Dr. Arya's expert testimony from her fact testimony." **Id.** at 29. Moreover, she argues Dr. Arya's treatment notes contained no suggestion of a causal relationship, nor lack thereof, between Appellant's medical issues and her pelvic implant. **Id.** at 27-28. Rather, Appellant maintains Dr. Arya's testimony revealed the doctor did not recall Appellant as a patient, and was unaware of much of her medical history. **Id.** Nevertheless, Appellant contends "Dr. Arya expressed a significant and unqualified opinion that [the pelvic mesh device] had not caused [Appellant] any complications, [but] has simply failed, which was a surgically and medically acceptable outcome." **Id.** at 28.

Appellant's argument fails for several reasons. First, the **Polett** Court placed no emphasis on the fact that the treating physician was qualified as an expert at trial. Rather, the Court focused on the fact that the physician's causation opinion was formed during the course of treatment, rather than in anticipation of litigation. **See Polett**, 126 A.3d at 924-26. **See also Crespo**, 167 A.3d at 182 (concluding treating physician was "qualified to comment as a fact witness on causation because his testimony was based on his observations, diagnosis, and medical judgment at the time he rendered treatment to [the plaintiff];" question posed to physician asked him to clarify "his own notes").

We also disagree with Appellant's contention that Dr. Arya's "opinion" was not developed during her treatment of Appellant and memorialized in her medical notes. As noted above, the question posed to Dr. Arya explicitly directed her to state if — at time she completed her assessment of Appellant — she believed Appellant was experiencing complications as a result of her pelvic mesh implant. **See** Arya's Combined Deposition at 57. Thus, her opinion was necessarily formed during her treatment of Appellant. Nor do we find it significant that Dr. Arya did not specifically recall Appellant as a patient. The physician's treatment notes from Appellant's second visit on August 10, 2015, indicated, *inter alia*:

> Urge and stress incontinence
> Prior **failed** mini-sling by Dr. Fagan
> Not keen on repeat sling for now

Arya's Progress Notes, 8/10/15 (emphasis added).  Therefore, the fact that Dr. Arya believed Appellant's continuing medical issues were the result of a "failed" implant rather than complications resulting from the implant can be reasonably deduced from her medical records.  Appellant's additional argument that Dr. Arya was unaware of the "significant aggravation of her urinary symptoms after" the implant, goes to the weight of Dr. Arya's testimony, not its admissibility.  *See* Appellant's Brief at 27.

Lastly, focusing on the third prong of Rule 701, Appellant argues Dr. Arya's testimony was improper because "[u]nder Pennsylvania law, '[i]t is generally accepted that the cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion.'"  Appellant's Brief at 25, *quoting* **Risperdal Litigation W.C. v. Janssen Pharmaceuticals, Inc.**, 174 A.3d 1110, 1121 (Pa. Super. 2017).  Because Dr. Arya's "causation testimony implicated her expertise as a urogynecologist to explain the cause of [Appellant's] urinary conditions, not her factual perception of [Appellant,]" Appellant insists the testimony "cannot be understood as lay opinion[.]"  *Id.* at 26.  Again, we disagree.

In **W.C.**, the minor plaintiff was prescribed Risperdal for the treatment of attention deficit disorder, and later developed "unexplained weight gain and gynecomastia," which is defined as "excessive development of the breast in the male."  **W.C.**, 174 A.3d at 1114 & n.3.  The minor plaintiff filed a complaint against the drug manufacturer as part of a mass tort program.  **Id.** at 114 & n.4.  At trial, over the minor plaintiff's objection, the trial court permitted a

physician assistant, who had treated the plaintiff and was not identified as an expert witness before or during trial, to offer the following opinion on the cause of the minor plaintiff's chest growth:

> [Manufacturer's Counsel]: And all of those weights we just reviewed were after Risperdal use had discontinued, correct?
>
> [Physician Assistant]: Yes, correct.
>
> [Manufacturer's Counsel: D]o you plan to offer any opinion as to — if indeed [the minor plaintiff] has chest growth**, do you plan to offer any opinion as to the cause of that chest growth?**
>
> [Physician Assistant]: **The extreme weight gain, I would say.**
>
> [Manufacturer's Counsel]: And what is the basis for that opinion?
>
> [Physician's Assistant]: Because he hasn't been on Risperdal since, we said, '07, so if he was taken off the Risperdal, the prolactin would have returned to normal.

*Id.* at 1121 (citation, footnote, and some emphasis omitted). The jury returned a verdict for the manufacturer, concluding that although the manufacturer was negligent in failing to provide an adequate warning concerning the risk of gynecomastia, the manufacturer's negligence did not cause the minor plaintiff's gynecomastia. *Id.* at 1116.

On appeal, this Court concluded that the physician assistant's opinion testimony was improper:

> [The physician assistant] was required to draw upon specialized medical knowledge concerning causation in order to opine that [the minor plaintiff's] breast growth was caused by weight gain. The effect of Risperdal on a hormone such as prolactin is clearly a subject that requires specialized knowledge. This testimony clearly required the use of "scientific, technical, or other specialized knowledge within the scope of Rule 702." Pa.R.E. 701. Thus, we conclude that the trial court erred in determining that

- 18 -

[the physician assistant's] testimony did not constitute expert testimony.

***W.C.***, 174 A.3d at 1122. Appellant asserts the same is true here since Dr. Arya's opinion — that Appellant's injuries were caused by a failure of the implant rather than complications from the implant — "required her to rely on her specialized knowledge beyond that possessed by the average layperson." Appellant's Brief at 26.

However, Appellant fails to recognize a key distinction between ***W.C.*** and the case *sub judice*. The causation opinion in ***W.C.*** did not arise during the physician assistant's treatment of the minor plaintiff, nor was it memorialized in her treatment notes. Indeed, the question posed to her asked if she "**plan[ned] to offer any opinion** as to the cause of [the] chest growth." ***W.C.***, 174 A.3d at 1121 (some emphasis omitted). That question, and the witness's response, demonstrated the opinion was "acquired or developed in anticipation of litigation for trial," rather than "based upon [her] observations, diagnosis, and medical judgment" at the time she treated the minor plaintiff. ***See*** Pa.R.C.P. 4003.5(a); ***Crespo***, 167 A.3d at 182. Accordingly, we find ***W.C.*** distinguishable on its facts.

Therefore, because we conclude the trial court did not abuse its discretion when it determined Dr. Arya's testimony constituted permissible lay opinion testimony, we affirm the judgment in favor of Appellees.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/11/2020