J-S44030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.Y.V., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M.P., MOTHER | No. 3210 EDA 2015 |

Appeal from the Decree entered September 29, 2015,
in the Court of Common Pleas of Philadelphia County, Family
Court, at Nos: CP-51-AP-0000024-2015, CP-51-DP-0002507-2011,
FID: 51-FN-004715-2011

| | |
|---|---|
| IN THE INTEREST OF: J.M.V., JR., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M.P., MOTHER | No. 3211 EDA 2015 |

Appeal from the Decree entered September 29, 2015,
in the Court of Common Pleas of Philadelphia County, Family
Court, at Nos: CP-51-AP-0000602-2015, CP-51-DP-0002508-2011,
FID: 51-FN-004715-2011

| | |
|---|---|
| IN THE INTEREST OF: J.J.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M.P., MOTHER | No. 3291 EDA 2015 |

Appeal from the Decree entered September 29, 2015,
in the Court of Common Pleas of Philadelphia County, Family
Court, at Nos: CP-51-AP-0000023-2015, CP-51-DP-0002505-2011,
FID: 51-FN-004715-2011

BEFORE: FORD ELLIOTT, P.J.E., STABILE, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.: **FILED JULY 21, 2016**

A.M.P. ("Mother") appeals from the decrees entered September 29, 2015, which involuntarily terminated her parental rights to her minor children, J.M.V., Jr., a male born in August of 2004; A.Y.V., a female born in

May of 2007; and J.J.P., a male born in December of 2011 (collectively, "the Children"). In addition, Mother appeals from the orders entered that same day, which changed the permanency goals of J.M.V., Jr., and A.Y.V. to adoption.[1] We affirm.

On December 27, 2011, the Philadelphia Department of Human Services ("DHS") filed dependency petitions with respect to each of the Children. In its petitions, DHS alleged that Mother tested positive for cocaine at the time of J.J.P.'s birth. Dependency Petitions, 12/27/11 (Statement of Facts at ¶ g). In addition, Mother lacked appropriate housing. *Id.* (Statement of Facts at ¶ d). Mother's whereabouts were unknown, and the Children were residing in the home of a family friend. *Id.* (Statement of Facts at ¶¶ d-k). The Children were adjudicated dependent by orders entered January 26, 2012.

On January 12, 2015, DHS filed petitions to involuntarily terminate Mother's parental rights to A.Y.V. and J.J.P., and petitions to change the permanency goals of A.Y.V. and J.J.P. to adoption. DHS filed a petition to involuntarily terminate Mother's parental rights to J.M.V., Jr., and a petition

---

[1] The trial court entered separate decrees terminating the parental rights of J.M.V., Sr. ("Father"), to J.M.V., Jr., and A.Y.V. The court also entered a decree terminating the parental rights of any unknown father that J.M.V., Jr., may have. The court did not enter a decree terminating Father's rights to J.J.P., nor did it enter an order changing J.J.P.'s permanency goal to adoption. During the termination and goal change hearing, the court indicated that it would continue the proceedings with respect to Father and J.J.P., so that a paternity test could be obtained in order to determine whether Father is J.J.P.'s biological father. N.T., 9/29/15, at 6-7, 144-45.

to change the permanency goal of J.M.V., Jr., to adoption on September 14, 2015. A termination and goal change hearing took place on September 29, 2015, during which the trial court heard the testimony of psychologist, Bill Russell, Ph.D.; psychologist, Erica Williams, Psy.D.; community umbrella agency case manager, Jose DeJesus; the pre-adoptive foster mother of A.Y.V. and J.J.P., O.T. ("Foster Mother"); Father; and Mother. Following the hearing, the trial court entered decrees terminating Mother's parental rights to the Children, and orders changing the permanency goals of J.M.V., Jr., and A.Y.V. to adoption. Mother timely filed notices of appeal from the decrees terminating her parental rights to J.M.V., Jr., and A.Y.V., as well as the orders changing the permanency goals of J.M.V., Jr., and A.Y.V. to adoption, on October 16, 2015. Mother timely filed a notice of appeal from the decree terminating her parental rights to J.J.P. on October 23, 2015.[2] Mother included a concise statement of errors complained of on appeal with each notice of appeal.

Mother now raises the following issues for our review.

A. Whether the trial court erred in denying the objection to the parenting capacity and bonding expert[s] to be qualified as

---

[2] The certified record contains two copies of notices of appeal with respect to J.J.P., one in J.J.P.'s adoption record, and one in J.J.P.'s dependency record. Both notices of appeal contain the docket number from J.J.P.'s adoption matter, as well as the docket number from J.J.P.'s dependency matter, and indicate that Mother is appealing from the "Order terminating parental rights of Mother and changing goal to adoption on September 29, 2015." Notice of Appeal, 10/23/15. As noted above, the trial court did not enter an order changing J.J.P.'s permanency goal to adoption on September 29, 2015.

experts where [DHS] did not present any evidence with regard to their qualifications?

B. Whether the trial court erred in involuntarily terminating the Mother's parental rights where there was [*sic*] the bonding evaluation was incredible in that Mother had consistently visited her Children and there was a bond between the Mother and Children and the termination of parental rights would have a negative effect on the developmental, physical and emotional needs of the Children?

Mother's brief at 5 (unnecessary capitalization omitted).[3]

Mother's first claim on appeal is that the trial court erred by permitting Dr. Russell and Dr. Williams to testify as experts during the termination and goal change hearing. Mother's brief at 8-10. Mother argues that there was no evidence presented during the hearing to confirm that Dr. Russell and Dr. Williams have the qualifications necessary to provide expert testimony. **Id.** at 8, 10. In its opinion pursuant to Pa.R.A.P. 1925(a)(2)(ii), the trial court explained that it permitted Dr. Russell and Dr. Williams to testify as experts because "both Dr. Russell and Dr. Williams had testified before the [trial

_____

[3] While Mother purports to appeal from the orders changing the permanency goals of J.M.V., Jr., and A.Y.V. to adoption, she does not raise any claim regarding these orders in her statement of question involved. Her brief includes no substantive discussion of the goal change orders, nor does it contain any citation to relevant authority. Accordingly, Mother has failed to preserve any challenge to the goal change orders for our review. **See Krebs v. United Refining Co. of Pa.**, 893 A.2d 776, 797 (Pa. Super. 2006) ("We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved, . . . .") (citations omitted); **In re W.H.**, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (quoting **In re A.C.**, 991 A.2d 884, 897 (Pa. Super. 2010)) ("'[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.'").

- 4 -

c]ourt on numerous occasions and had been certified as [e]xperts and found qualified to offer opinions in their respective areas of expertise." Trial Court Opinion, 2/10/16, at 13.

> Admission of evidence is within the sound discretion of the trial court and a trial court's rulings on the admission of evidence will not be overturned absent an abuse of discretion or misapplication of law. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Schuenemann v. Dreemz*, *LLC*, 34 A.3d 94, 100-01 (Pa. Super. 2011) (quotations and citations omitted).

The admission of expert testimony is governed by Rule 702 of the Pennsylvania Rules of Evidence. Rule 702 provides as follows.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

> It is well established in this Commonwealth that the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the

subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. It is also well established that a witness may be qualified to render an expert opinion based on training and experience. Formal education on the subject matter of the testimony is not required, . . . . It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field, only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience.

**Miller v. Brass Rail Tavern, Inc.**, 664 A.2d 525, 528 (Pa. 1995) (citations and emphasis omitted).

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by permitting Dr. Russell and Dr. Williams to provide expert testimony. With respect to Dr. Russell, the record reveals that sufficient testimony was presented during the termination and goal change hearing to confirm that he was qualified to testify as an expert witness. Dr. Russell testified that he is a psychologist employed by Assessment and Treatment Alternatives and Forensic Mental Health Services. N.T., 9/29/15, at 9-10. Dr. Russell stated that he performed a parenting capacity evaluation with respect to Mother, and he explained in detail how such evaluations are performed.[4] **Id.** at 10-12. Dr. Russell noted

---

[4] As a result of this evaluation, Dr. Russell prepared a Report of Forensic Evaluation, dated August 19, 2014. **See** DHS Exhibit 1. In his report, Dr. Russell concluded that Mother is not currently able to provide the Children with safety and permanency. **Id.** at 12 (unnumbered pages). Dr. Russell emphasized that Mother has a history of poor decision making, and that Mother minimizes the impact that her poor choices have had on the Children. **Id.** Dr. Russell also expressed concern that Mother is unemployed and has no immediate plans to obtain employment. **Id.**

- 6 -

that he has been doing contract work for DHS since approximately 1992, and that he performs an average of two parenting capacity evaluations per week, "depending on shows and no-shows." *Id.* at 32-33. Thus, it is clear that that Dr. Russell possesses at least a "reasonable pretension to specialized knowledge" in the subject of parental capacity. *See Miller*, 664 A.2d at 528.

With respect to Dr. Williams, we observe that Mother's counsel did not object to the trial court's ruling that she was qualified to testify as an expert. As a result, Mother has failed to preserve a challenge to the testimony of Dr. Williams for our review. *See Rancosky v. Washington Nat. Ins. Co.*, 130 A.3d 79, 102 (Pa. Super. 2015), *reargument denied* (Feb. 25, 2016) (citing *Shelhamer v. John Crane, Inc.*, 58 A.3d 767, 770 (Pa. Super. 2012); Pa.R.C.P. 227.1(b)(1); Pa.R.A.P. 302(a)) ("In order to preserve an issue for appellate purposes, the party must make a timely and specific objection to ensure that the trial court has the opportunity to correct the alleged trial error.").

Mother's second claim is that the trial court erred by terminating her parental rights with respect to the Children. We consider this issue mindful of the following.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an

abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b), which provide as follows.

**a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the

developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

In her brief on appeal, Mother makes no effort to argue that the trial court erred by terminating her parental rights pursuant to Section 2511(a). Instead, Mother challenges the court's analysis pursuant to Section 2511(b). Mother argues that the Children are bonded to her, and that terminating her parental rights will be detrimental to them. Mother's brief at 11-13.

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

- 10 -

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the trial court concluded that terminating Mother's parental rights would best serve the needs and welfare of the Children. Trial Court Opinion, 2/10/16, at 12. The court found that the Children have a relationship with Mother, but that the Children would not suffer irreparable harm if Mother's parental rights are terminated. *Id.* The court observed that the Children are doing well in their foster homes, and that J.J.P. and A.Y.V. refer to their foster mother as their mother. *Id.*

We again conclude that the trial court did not abuse its discretion. During the termination and goal change hearing, Dr. Williams testified that she completed a bonding evaluation with respect to Mother and the Children in November of 2014. N.T., 9/29/15, at 48. During the evaluation, Dr. Williams observed Mother interact with the Children for approximately an hour. *Id.* at 49, 62. Dr. Williams noted that the Children were happy to see Mother, that they sought Mother's attention during the evaluation, and that they appeared to enjoy Mother's company. *Id.* at 51, 53. Dr. Williams also noted that the Children hugged Mother at the conclusion of the evaluation, although they left the evaluation without resistance. *Id.* at 52, 57. Based on this evaluation, Dr. Williams concluded that the Children have a bond with Mother. *Id.* at 53-54. However, Dr. Williams observed that the bond

"doesn't appear to be one of a caregiver. . . . [I]t wasn't one where she was the parent or the caregiver of the [C]hildren." *Id.* at 53. Dr. Williams opined that the Children would not suffer irreparable harm if Mother's parental rights were terminated, so long as they are provided with "proper support." *Id.* at 53-54.

Community umbrella agency case manager, Jose DeJesus, testified that A.Y.V. and J.J.P. have resided with Foster Mother since 2011. *Id.* at 71-72. Mr. DeJesus observed that A.Y.V. and J.J.P. refer to Foster Mother as their mother. *Id.* at 72-73. In contrast, A.Y.V., refers to Mother by her first name. *Id.* at 72. A.Y.V. has indicated that she does not want to attend her visits with Mother, and both A.Y.V. and J.J.P. are excited to see Foster Mother at the conclusion of Mother's visits. *Id.* at 89-91. With respect to J.M.V., Jr., Mr. DeJesus testified that he would like to live with his previous foster father. *Id.* at 74. Mr. DeJesus explained that the plan is for J.M.V., Jr., to return to his previous foster father, and that the foster father will act as a pre-adoptive resource. *Id.* Mr. DeJesus did not believe that the Children will suffer irreparable harm if Mother's parental rights are terminated. *Id.* Mr. DeJesus opined that it would be in the best interest of the Children to be freed for adoption. *Id.*

Finally, Foster Mother testified that Mother has occasionally missed her visits with A.Y.V. and J.J.P. since they were placed in Foster Mother's care. *Id.* at 106-08. A.Y.V. initially would be upset when Mother failed to attend

- 12 -

her visits. *Id.* at 106-07. A.Y.V. would ask where Mother was and if Mother loved her. *Id.* at 106. More recently, Foster Mother observed that A.Y.V. has become resistant to attending visits, and "doesn't really care" when Mother fails to attend. *Id.* at 109, 111. Foster Mother further explained that J.J.P. was very young when he was removed from Mother's care, and he does not understand that Mother is his mother. *Id.* at 109. J.J.P. gets very emotional before visits, and also does not want to attend. *Id.* After visits, A.Y.V. and J.J.P. exhibit aggressive behaviors, and "it takes one or two days to get them back into a routine." *Id.* at 109-11.

Thus, the record supports the trial court's finding that it would best serve the needs and welfare of the Children to terminate Mother's parental rights. While Mother and the Children share a bond, the record confirms that it is not a parental/child bond. Moreover, the Children are in need of permanence and stability. At the time of the termination and goal change hearing, the Children had been in foster care for over three and a half years. Pre-adoptive resources are available for the Children, and the record indicates that the Children will not suffer irreparable harm if Mother's parental rights are terminated.

Accordingly, because we conclude that the trial court did not abuse its discretion by terminating Mother's parental rights, and because Mother has failed to preserve any challenge with respect to the orders changing the

permanency goals of A.Y.V. and J.M.V., Jr., to adoption, we affirm the decrees and orders of the trial court.

Decrees affirmed. Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/21/2016